Filed 5/30/24  In re J.D. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.D., et al., Persons Coming Under the Juvenile Court Law. | B328713 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>E.D.<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. 19CCJP01722H-J) |

APPEAL from an order of the Superior Court of Los Angeles County, Lucia J. Murillo, Judge Pro Tempore.  Affirmed.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant E.D.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

The juvenile court assumed dependency jurisdiction over minors Jan.D., Jo.D., and Jac.D. following an incident in which E.D. (Father) arrived home drunk with a self-inflicted gunshot wound, physically abused the minors, and threatened to kill them. We are asked to decide whether substantial evidence supports the juvenile court's finding that returning the minors to Father's custody at the six-month review hearing would create a substantial risk of detriment to their physical or emotional well-being.

## I. BACKGROUND

This is the second appeal in these dependency proceedings that commenced in juvenile court in June 2022.[1] We previously affirmed the juvenile court's disposition order in *In re J.D.* (Sept. 15, 2023, B323583) [nonpub. opn.]). We draw on that opinion in summarizing the facts from the initial investigation through disposition.

---

[1] Earlier, the juvenile court sustained a different dependency petition alleging Father failed to seek timely mental health treatment for Jan.D. and Jac.D. Father was ordered to participate in drug and alcohol services, family preservation services, and individual counseling. The juvenile court terminated dependency jurisdiction about six months later, and this court dismissed as moot Father's appeal from the juvenile court's jurisdiction findings and disposition order. (*In re G.D.* (Aug. 16, 2022, B314503) [nonpub. opn.].)

*A.* *Investigation, Assumption of Dependency*
*Jurisdiction, and Disposition*

Jan.D. was born in 2006, Jo.D. was born in 2008, and Jac.D. was born in 2009. Father was awarded sole legal and physical custody of the minors in 2019 after the juvenile court sustained a dependency petition alleging they were at risk based on V.M.'s (Mother's) conduct.

The events that led to these proceedings occurred in June 2022, when the Los Angeles Department of Children and Family Services (the Department) was notified of a disturbance at the family home. The Department was informed police responded to the home late one evening after receiving reports that Father was assaulting the minors. The minors ran outside when officers arrived and said Father had hit them. The officers saw Father inside the home with blood on his hand. Father attempted to close the door on the officers, but he was taken into custody without further incident. Father had a gunshot wound to his left hand, and officers discovered a bullet hole and traces of skin in his car. Officers did not observe any obvious physical injuries to the minors.[2]

Jan.D. told police that Jo.D. woke her up because Father was outside in his car and appeared intoxicated. Jan.D. approached Father with her younger siblings and Father "began to yell" at her. When he "abruptly" exited the car, Jan.D. ran inside and locked the door. She let Father inside, however,

---

[2] The police report noted there were cockroaches and rat feces throughout the kitchen and disturbing slogans written on the minors' bedroom walls.

3

because she feared the situation "would escalate further" as Father "began to bang on the door."

Jan.D. told officers that Father hit all three minors multiple times and said he would "kill [them] if [they] [did not] listen" to him. Jan.D. directed Jac.D. to have a neighbor call the police, and when the neighbor came to the family home to intervene, he and Father "got in a verbal altercation." Jan.D. then directed Jo.D. to remove Father's gun from his car (he "always keeps a gun inside the vehicle") because she was afraid he "might use the gun against [the minors]." Police recovered this gun plus several others that Father kept in his bedroom. Jac.D. declined to provide a statement to officers because he was "used to this type of behavior."

A Department social worker spoke with the minors the following day. Jan.D. expanded on her statements to police, explaining Father was drunk and told her he accidentally shot himself in the hand. Jan.D. tried to help him clean the wound, but he "refused" and "began to hit her and her siblings." He told them, "you are the worst thing that ever happened to me. I have to do all this for you guys and you don't do anything for me. I am going to kill you." Jan.D. knew Father kept a loaded handgun in his car, so she and her siblings ran outside to hide it.[3] Jan.D. said Father occasionally drinks, but he was never aggressive and had not previously abused her or her siblings. Jo.D. and Jac.D. both said Father drinks "a lot," but similarly agreed he had never become aggressive before.

---

[3]     Jo.D. and Jac.D. corroborated Jan.D.'s account of what happened.

4

A Department social worker discussed the incident with the minors once again about three weeks later. All three of the minors stated Father pushed them out of his way after he exited the car, but Jan.D. and Jac.D. now denied that Father hit them. Jan.D. also denied Father said he was going to kill them. Jo.D. and Jac.D. now also suggested Father was not a heavy drinker.

Father told a Department social worker he was drunk the day of the incident. He "blacked out" and had no recollection of "anything after arriving home," but he "was apologetic and took full responsibility for his actions despite not knowing exactly what had occurred." Father said the minors are aware he keeps guns in safes in the home, but he maintained they "have never had access to the guns." Father acknowledged alcohol was "a 'demon' he needed to overcome" and explained he had "turn[ed] to alcohol to cope" with stress caused by work, his mother's health problems, and fatherhood. More specifically, with respect to fatherhood, Father emphasized "he had been struggling with how to respond to his children regarding their mother's actions and their emotions regarding not having her in their life."

The juvenile court detained the minors from Father in July 2022. As of August 2022, Father was visiting the minors at his sister's home every weekend and speaking to them via video every day. He was participating in a substance abuse program, a parenting class, and individual therapy.

At a jurisdiction and disposition hearing in September 2022, Father pled no contest to dependency petition allegations that the children were at substantial risk of suffering serious physical harm based on Father's physical abuse, his history of substance abuse (including marijuana and alcohol), and his possession of a firearm. The Department asked the juvenile court

to remove the minors from Father's care and order monitored visitation. Father requested that the minors be released to his custody or that he be granted unmonitored visitation, including weekends and vacations. Counsel for the minors joined in Father's requests, with the condition that the juvenile court should order unannounced visits by Department social workers and/or drug testing.

The juvenile court ordered the minors removed from Father's custody, placed them with Father's sister S.D. (Aunt), and authorized monitored day visits between Father and minors in Aunt's home. Father was also allowed unmonitored visits in a neutral or public setting provided he did not drive the minors.[4] The juvenile court ordered Father to participate in a full drug and alcohol program, weekly drug and alcohol testing, a 12-step program with a court card and sponsor, parenting classes, and individual counseling.

### B. Reunification Period

Between the adjudication and disposition hearing and the six-month review hearing in April 2023, Father completed a parenting program, a chemical dependency outpatient program, and a chemical dependency counseling program. He attended Alcoholics Anonymous meetings, but he did not have a sponsor. He tested regularly through January 2023, at which point the Department reported his testing "ended" as scheduled. Although

---

[4] Although the juvenile court denied Father's blanket request for unmonitored overnight and weekend visits, it indicated it would assess any requests to accompany the children on extended trips "on a case-by-case basis . . . depending on where the trip is and who else will be there."

Father never tested positive for alcohol, he consistently tested positive for marijuana.  Father told a Department social worker he used marijuana to sleep and manage shoulder pain.

Father visited the minors regularly, progressing from lightly monitored visits, to unmonitored visits in public or neutral locations, to unmonitored overnight visits.  As we shall discuss, visits were positive and there were no concerns reported until March 2023.

During the reunification period, Jac.D. showed "great improvement" while placed with Aunt and initially indicated he wanted to stay in her home until he finished high school.  Jan.D. and Jo.D. initially did well in the placement, but Aunt notified the Department shortly before the six-month review hearing that she could no longer care for them because they would not stop using marijuana.

Around the end of March 2023, the Department received an anonymous report that Father was drinking, slurring his words, and yelling for Jan.D. (who was not at home).  Around the same time, Jac.D. told a social worker he noticed a bottle of alcohol in his Father's freezer and was "sure [Father] was drinking again," though he did not observe Father to be under the influence of alcohol during visits.  Jan.D. also saw alcohol in Father's home.  Aunt told a social worker Father admitted to her that he had been drinking.  Aunt also reported "there were weekends when one of the children would decline to go to [Father's] for concern of his drinking or just because they did not want to go."  Aunt's

daughter and the minors' cousin, J.R., also suspected Father was drinking again.[5]

Father denied he had resumed drinking, and a Department social worker found no sign of alcohol during an unannounced home visit.

At the time of the six-month review hearing in April 2023, all three minors indicated they wanted to return home to Father. Both Jan.D. and Jo.D. were unhappy living with Aunt, and Jo.D. complained she "was called a snitch for telling [Father] that [Aunt] [was] aware of his drinking." Jac.D. retained a strong bond with Aunt, but he wanted to return to Father's home so long as Father was not drinking.

### C.    Six-Month Review Hearing

The juvenile court held the six-month review hearing in April 2023. Father asked the court to return the minors to his custody. Minors' counsel asked that Jan.D. and Jo.D. be returned to Father's care and indicated Jac.D. was "willing to remain" with Aunt until the end of the school year. The Department's position was that the court should keep the children in their placements and order three more months of reunification services.

Father testified and maintained he had not had a drink since the June 2022 incident that gave rise to the dependency proceedings. He claimed he continued to attend Alcoholics Anonymous meetings and individual therapy.[6] He had "no idea"

---

[5]    J.R. monitored some of Father's visits with the minors, but the record does not indicate whether she lived with Aunt and the minors.

[6]    Father indicated these programs were relevant to a pending criminal matter, but he did not specify whether the

why Aunt told a social worker he admitted to drinking.  He also asserted Jan.D. and Jac.D. were lying about having seen alcohol in his home.  Father opined they lied because Jan.D. "say[s] stuff out of anger"[7] and Jac.D. had found "a mother figure" in Aunt.

Father further testified that the June 2022 incident was attributable to his lack of "skills to cope with" his father's death and his mother's health issues.  Through the programs he completed and in which he was still participating, he had "gained the skills, tools on how to cope with [his] emotions . . . ."  When asked to elaborate on the skills he learned, Father answered, "[l]ike that prayer I can't remember right now.  God give me the, the—I wish I can look it up.  To recognize the things I can't control and to cope with the things that I can . . . ."  The juvenile court suggested "the prayer [he was] trying to recall [was] the Serenity Prayer that they recite in A.A. meetings," and Father confirmed that it was.  But Father could not remember it "word by word."  Father testified he did not obtain a sponsor in Alcoholics Anonymous because he did not "feel [he] need[ed] one because [he] ha[d] so many other things [he was] still doing to provide [the court] facts and proof that [he was] progressing."  In addition, Father testified his programs taught him to "try[ ] to bring patience, strength, wisdom; how to diffuse [sic] situations; how to talk to [his] children; how to get down to their level; how

---

criminal matter related to the June 2022 incident or whether his participation in these programs was pursuant to a court order.

[7]    Jan.D. did not testify, but her attorney did tell the court that Jan.D. said her statement regarding Father's drinking was made "in anger."

9

to speak to them and come back as an adult because [he is] their father; [and] how not to be catastrophic with them."

After the presentation of evidence, the juvenile court found Father had made substantial progress on his case plan but returning minors to Father's care was unwarranted because there was a substantial risk it would be detrimental. The juvenile court reasoned Father "still ha[d] a way to go in his recovery" because, if his participation in Alcoholics Anonymous were "genuine," "he would have been able to recite the Serenity Prayer which is recited at the start of every meeting." Moreover, the juvenile court credited Jan.D. and Jac.D.'s statements regarding alcohol in Father's home because they were "looking forward [to] going back to Father" and "all of a sudden . . . changed their minds." The court did not believe the minors did this "arbitrarily" because "[t]hey are older children who understand the ramifications of their words."

The juvenile court retained jurisdiction over the minors and ordered additional reunification services for Father pending a status review hearing set to occur six months later.

## II. DISCUSSION

Father contends no substantial evidence supports the juvenile court's finding that returning the minors to his care would be detrimental to them. Notwithstanding Father's substantial completion of his court-ordered case plan, the juvenile court was entitled to credit (and did credit) reports by Aunt and two of the children that Father had resumed drinking. So credited, no additional evidence to corroborate Jan.D., Jac.D., and Aunt's statements was required (see, e.g., *In re Lana S.* (2012) 207 Cal.App.4th 94, 104), and the trial court had a sound basis

10

for finding that giving Father custody of the minors posed too great a risk to their safety.

At the six-month review hearing, the juvenile court "shall order the return of the child to the physical custody of their parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (Welf. & Inst. Code,[8] § 366.21, subd. (e)(1).) The Department bears the burden of proving risk of detriment. (§ 366.21, subd. (e)(1).)

In determining whether placing a minor with their parent would be detrimental, the juvenile court considers, among other things, "the social worker's report and recommendations[,] . . . the efforts or progress, or both, demonstrated by the parent[,] . . . and the extent to which [the parent] availed themselves of services provided . . . ." (§ 366.21, subd. (e)(1).)

A substantial risk of detriment does not "'mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.' [Citation.]" (*In re E.D.* (2013) 217 Cal.App.4th 960, 965.) However, "[d]etriment can be shown many different ways" (*A.H. v. Superior Court* (2010) 182 Cal.App.4th 1050, 1059), and a parent's compliance with his or her reunification plan does not preclude a detriment finding. (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704 [holding, with respect to 18-

---

[8] Undesignated statutory references that follow are to the Welfare and Institutions Code.

11

month hearing, that "[c]ompliance with the reunification plan is certainly a pertinent consideration," but "it is not the sole concern before the dependency court judge"].)

We review a juvenile court's detriment finding for substantial evidence. (*E.D.*, *supra*, 217 Cal.App.4th at 966.)

Father believes the juvenile court's detriment finding is unsound because he complied with his case plan and maintained consistent, unproblematic visitation with the minors—who wanted to return to his care. Notwithstanding Father's efforts to comply with court-ordered services, substantial evidence still supports the juvenile court's determination that there remained a substantial risk of detriment to the minors. Both Jan.D. and Jac.D. told a social worker they saw alcohol in Father's home and Aunt reported Father disclosed he was drinking again. And given Father's history, this was a serious concern.

Father counters that these statements from multiple sources are negated by other evidence (or, more precisely, the lack thereof): the absence of any positive tests for alcohol use, no statements by the minors that they observed him under the influence, and no report from social workers who inspected his home that they observed alcohol. The juvenile court, however, provided a compelling rationale for its decision to credit Jan.D. and Jac.D.'s statements regarding alcohol in Father's home. Both were previously eager to return to Father's care—indeed, they *still* wanted to return to Father's care—and neither child had any apparent motive to lie. In addition, Father's evidence that he did not resume drinking in March 2023 is just of snapshot quality, proving only that he was not drinking at specific points

12

in time and in no way refuting the testimony the juvenile court credited.[9]

DISPOSITION

The juvenile court's order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, Acting P. J.

We concur:

KIM, J.                                    LEE, J.[*]

---

[9] The record indicates Father's negative tests for alcohol use continued to January 2023 but the statements the juvenile court relied on suggesting Father had resumed drinking were all made weeks later, in March 2023. The fact that the minors never saw Father under the influence of alcohol proves only that he was not drinking heavily just before or during visits. And the fact that a single home inspection did not reveal evidence that Father had resumed drinking is not especially probative; the juvenile court could reasonably conclude Father had alcohol in the home at other times or the social worker may not have discovered alcohol that was present at the time of the inspection.

[*] Judge of the San Bernardino County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.